UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

       v.

[1] CHRISTOPHER V. CICCIONE,II
[2] JOSE BAYRON PIEDRAHITA-CEBALLOS
a.k.a. "Cacheton," a.k.a. "Montanero"
[3] JUAN CARLOS VELASCO CANO,
  a/k/a "Cabezon"

Case Number 17-20651-*CR-SCOLA*

AFFIDAVIT IN SUPPORT OF
REQUEST FOR EXTRADITION

I, Jennifer A. Clarke, being duly sworn, depose and state:

1.     I reside in the United States of America.

2.     In May 2006, I received a Juris Doctor degree from the George Mason University School of Law in Arlington, Virginia, and was admitted to the bar of the state of Virginia in the same year.   I was admitted to the bar of the District of Columbia in 2007.   From January 2007 to early 2013, I was employed as an Assistant Commonwealth's Attorney in Fauquier and Arlington Counties in the Commonwealth of Virginia.

3.     From early 2013 to January 2016, I served in the U.S. Attorney's Office for the Eastern District of Virginia.   Since January 2016, I have served in the Department of Justice, Criminal Division, Public Integrity Section.   As a Trial Attorney for the Department of Justice, my duties include the prosecution of persons charged with criminal violations of the laws of the United States.   Based on my training and experience, I am familiar with the criminal laws and procedures of the United States.   During my tenure at the Department of Justice, I have become particularly knowledgeable in the area of criminal law relating to violations of the corruption statutes, including bribery, extortion, honest services fraud, obstruction of justice, and conspiracy.

4. In the course of my official duties, I have become familiar with the charges and evidence against JOSE BAYRON PIEDRAHITA CEBALLOS, also known as (a.k.a.) Jose Bayron Piedrahita-Ceballos, a.k.a. "Cacheton," a.k.a. "Montanero" (PIEDRAHITA), in the case entitled <u>United States of America v. Christopher V. Ciccione, II, et al.</u>, Case Number 17-20651, which arose from an investigation into a conspiracy to defraud the United States by means of a corrupt relationship of which PIEDRAHITA is part.

## I. THE GRAND JURY PROCESS

5. Under the laws of the United States, a criminal prosecution may be commenced by a grand jury on its own decision to return and file an indictment with the Clerk of the U.S. District Court.   A grand jury is an independent body that is empaneled by the court, composed of at least 16 and no more than 23 people whom the U.S. District Court selects at random from the residents of that district.

6. The purpose of the grand jury is to view the evidence of crimes presented to it by U.S. law enforcement authorities.   After independently viewing this evidence, each member of the grand jury must determine if there is probable cause to believe that a crime has been committed, and that the particular defendant committed the crime.   A grand jury returns an indictment when at least 12 grand jurors have voted in favor of an indictment.   An indictment is a formal document that charges the defendant with a crime or crimes, describes the specific laws that the defendant is accused of violating, and describes the acts of the defendant that are alleged to be violations of the law.   After the grand jury returns the indictment, a warrant for the defendant's arrest generally is issued by a U.S. district or magistrate judge.

## II. THE CHARGES AND PERTINENT LAW

7.    On September 21, 2017, a federal grand jury sitting in the Southern District of Florida

returned and filed an Indictment against PIEDRAHITA, charging him with the following

offenses: in **Count One**, with conspiracy to defraud the United States, to commit honest

services fraud, and to obstruct justice, in violation of Title 18, United States Code, Sections

371, 1343, 1346, and 1503; in **Counts Two through Five**, with honest services fraud,

through bribery and by means of wire and radio communications in interstate commerce,

and aiding and abetting this offense, in violation of Title 18, United States Code, Sections

1343, 1346, and 2; and in **Count Six**, with obstruction of the due administration of justice,

by means of a series of materially false statements, representations, and omissions, and

aiding and abetting this offense, in violation of Title 18, United States Code, Sections 1503

and 2.    The Indictment also contains forfeiture allegations under Title 18, United States

Code, Section 981; Title 21, United States Code, Section 853; and Title 28, United States

Code, Section 2461, in relation to Counts One through Five. PIEDRAHITA has not been

previously prosecuted, convicted, or ordered to serve a sentence for any of these offenses

for which extradition is sought.    Please note, JOSE BAYRON PIEDRAHITA

CEBALLOS was indicted under the name of "Jose Bayron Piedrahita-Ceballos," rather

than his correct name, JOSE BAYRON PIEDRAHITA CEBALLOS.    This does not affect

the validity of the Indictment under U.S. law.    Likewise, the fact that the arrest warrant for

JOSE BAYRON PIEDRAHITA CEBALLOS was issued under the name of "Jose Bayron

Piedrahita-Ceballos," does not affect the validity of the arrest warrant, and it remains valid

and executable, as stated below. Under U.S. law, a fugitive's name can be amended or

corrected in those documents at any time, including after his extradition to the United

States.

3

8.    The relevant portions of the applicable statutes are attached to this affidavit as **Exhibit A**. Each of these statutes was duly enacted and in force at the time the offenses were committed and at the time the Indictment was returned, and they remain in full force and effect.   The relevant criminal offenses charged in the Indictment constitute felonies under the laws of the United States.

9.    I have also included as part of **Exhibit A** the relevant portion of Title 18, United States Code, Section 3282, which is the statute of limitations for the crimes charged in the Indictment.   The statute of limitations requires that a defendant be formally charged within five years of the date that the offense or offenses were committed. Once an indictment has been filed in a federal district court, as with the charges against PIEDRAHITA, the statute of limitations is tolled and no longer runs.   This prevents a criminal from escaping justice by simply hiding and remaining a fugitive for an extended period of time.   In addition, under the laws of the United States, the statute of limitations for a continuing offense, such as conspiracy, begins to run from the conclusion or completion of the offense, not from the date it commenced.

10.    In addition, I have included as part of **Exhibit A** the relevant portion of Title 18, United States Code, Section 3292, which is the statute that authorizes the pre-indictment suspension of the statute of limitations when the U.S. government seeks to obtain evidence located in a foreign country.   In order to grant the application, the judge before whom the application is presented must first determine that the government has, in fact, made an official request for evidence located in a foreign country; and that based on the information before the judge, it reasonably appears that, at the time the request for evidence was made, the evidence is or was in the foreign country.   When granted by the Court, the period of

suspension begins on the date the request for foreign evidence was made and extends for a period not to exceed three years.

11.   I have thoroughly reviewed the applicable statute of limitations, and the prosecution of the charges in this case is not barred by the statute of limitations.   Because the Indictment, which was returned and filed on September 21, 2017, charges offenses which occurred from in or about February 2010 until October 28, 2011, and given that the tolling provisions of Title 18, United States Code, Section 3292, suspended the statute of limitations from May 5, 2016, PIEDRAHITA was formally charged within the five-year time period specified in the statute of limitations.

12.   Based on the charges in the Indictment, on September 21, 2017, the U.S. District Court for the Southern District of Florida issued a warrant for the arrest of PIEDRAHITA.   This arrest warrant remains valid and executable.

13.   It is the practice of the U.S. District Court for the Southern District of Florida to retain original indictments and arrest warrants and file them with the records of the Court. Therefore, I have obtained certified copies of the Indictment and arrest warrant from the Clerk of the Court and have attached them to this affidavit as **Exhibit B** and **Exhibit C**, respectively.

14.   PIEDRAHITA is charged in Count One of the Indictment with the offense of conspiracy. Under U.S. law, a conspiracy is an agreement to violate other criminal statutes.   In other words, under U.S. law, the act of combining and agreeing with one or more persons to violate U.S. law is a crime in and of itself.   Such an agreement need not be formal and may be simply a verbal or non-verbal understanding.   A conspiracy is deemed to be a partnership for criminal purposes in which each member or participant becomes the agent or partner of every other member.   A person may become a member of a conspiracy

without full knowledge of all of the details of the unlawful scheme or the names and identities of all of the other alleged co-conspirators. Consequently, if a defendant has an understanding of the unlawful nature of a plan and knowingly and willfully joins in that plan on at least one occasion, that is sufficient to convict him of conspiracy even if he had not participated before and even if he played only a minor part. Similarly, a defendant need not be aware of all of the acts of his co-conspirators in order to be held liable for these acts, provided that he is a knowing member of the conspiracy, and the acts of the co-conspirators were foreseeable and within the scope of the conspiracy.

15.   Count One of the Indictment charges PIEDRAHITA with a multi-object conspiracy to defraud the United States, to commit honest services fraud, and to obstruct justice. Regarding the felony offense in Count One, the United States must show that PIEDRAHITA came to an agreement with one or more persons to accomplish a common and unlawful plan as charged in Count One of the Indictment, and that he knowingly and willfully became a member of such conspiracy. The maximum penalty for a violation of Title 18, United States Code, Section 371, as charged in Count One of the Indictment, is 5 years' imprisonment, a fine not to exceed US$250,000, and a term of supervised release of not more than three years.

16.   Counts Two through Five of the Indictment charge PIEDRAHITA with honest services fraud, through bribery and by means of wire and radio communications in interstate commerce. Regarding the felony offense charged in Counts Two through Five, the United States must show that PIEDRAHITA, for each count, knowingly devised or participated in a scheme to fraudulently deprive the public of the right to honest services of co-defendant Christopher V. Ciccione, II (Ciccione), a Special Agent for the U.S. Department of Homeland Security, through bribery or kickbacks, that PIEDRAHITA did so with an intent

to defraud the public of the right to co-defendant Ciccione's honest services, and that

PIEDRAHITA transmitted or caused to be transmitted by wire some communication in

interstate commerce to help carry out the scheme to defraud.   The maximum penalty for a

violation of Title 18, United States Code, Sections 1343 and 1346, as charged in Counts

Two through Five of the Indictment, is twenty years' imprisonment, a fine not to exceed

US$250,000, and a term of supervised release of not more than three years in addition to

any term of imprisonment.

17.   Count Six of the Indictment charges PIEDRAHITA with obstruction of the due

administration of justice.   Regarding the felony offense charged in Count Six, the United

States must show that PIEDRAHITA, corruptly or by threats, endeavored to influence,

obstruct, or impede the due administration of justice.   The maximum penalty for a

violation of Title 18, United States Code, Section 1503, as charged in Count Six of the

Indictment, is ten years' imprisonment, a fine not to exceed US$250,000, and a term of

supervised release of not less than three years in addition to any term of imprisonment.

18.   Counts Two through Six of the Indictment also charge that PIEDRAHITA committed the

offenses by aiding and abetting the crime pursuant to Title 18, United States Code, Section

2.   Under Title 18, United States Code, Section 2, whoever commands, procures, assists in,

or causes the commission of a crime shall be held accountable and punished in the same

manner as the principal, or the person who actually carried out the task.   This means that

the guilt of a defendant may also be shown even if he did not personally perform every act

involved in the commission of the crime charged.   The law recognizes that, ordinarily,

anything a person can do for himself may also be accomplished through direction of

another person as an agent, or by acting together with, or under the direction of, another

person or persons in a joint effort.   So, if the acts or conduct of an agent, employee, or

other associate of a defendant were willfully directed or authorized by the defendant, or if the defendant aided or abetted another person by willfully joining together with that person in the commission of a crime, then the law holds the defendant responsible for the conduct of that other person just as though the defendant had engaged in that conduct himself.

19. The United States will prove its case against PIEDRAHITA through various types of evidence, including lawfully intercepted communications, physical evidence, and witness testimony.   All of the defendant's criminal conduct alleged in the Indictment occurred after December 17, 1997.

## III. SUMMARY OF THE FACTS

20. Attached as **Exhibit D** is the original affidavit of Department of Homeland Security Special Agent Reynaldo J. Rodriguez, which provides additional information on the criminal activities and identification of PIEDRAHITA.

21. Based on my review of Special Agent Reynaldo J. Rodriguez's affidavit and the evidence in this case, I attest that the evidence indicates that JOSE BAYRON PIEDRAHITA-CEBALLOS is guilty of the offenses for which extradition is sought.

JENNIFER A. CLARKE
Trial Attorney
U.S. Department of Justice
Public Integrity Section


SIGNED AND SUBSCRIBED TO BEFORE ME
THIS __3__ DAY OF _November_, 2017

HON. _Robert N. Scola, Jr_
United States ~~Magistrate Judge~~ District Judge
Southern District of Florida

<u>EXHIBIT LIST</u>

**Exhibit A**    Relevant Portions of Applicable Statutes

**Exhibit B**    Certified copy of the Indictment

**Exhibit C**    Certified copy of the arrest warrant for JOSE BAYRON PIEDRAHITA CEBALLOS

**Exhibit D**    Affidavit of Department of Homeland Security Special Agent Reynaldo J. Rodriguez

**Attachment-1** Colombian Cédula of JOSE BAYRON PIEDRAHITA CEBALLOS

# Exhibit A

**Exhibit A** contains the applicable portions of statutes describing the offenses with which JOSE BAYRON PIEDRAHITA CEBALLOS is charged, the statute of limitations, and the penalties he faces if convicted.  Ellipses are used to indicate portions of the statutes that are omitted because these portions do not apply to the case against JOSE BAYRON PIEDRAHITA CEBALLOS.

**Title 18, United States Code, Section 2.**          Aiding and Abetting

(a)  Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b)  Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**Title 18, United States Code, Section 3282.**                              **Offenses not capital**

(a) In general.--Except as otherwise expressly provided by law, no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.

**Title 18, United States Code, Section 3292.**   **Suspension of limitations to permit United States to Obtain Foreign Evidence**

(a)(1) Upon application of the United States, filed before return of an indictment, indicating that evidence of an offense is in a foreign country, the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. . .;

(b)  a period of suspension under this section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request. . .;

(d) As used in this section, the term "official request" means a letter rogatory, a request under a treaty or convention, or any other request for evidence made by a court of the United States or an authority of the United States having criminal law enforcement responsibility, to a court or other authority of a foreign country.

**Title 18, United States Code, Section 371.**     **Conspiracy to commit offense or to defraud United States**

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

**Title 18, United States Code, Section 1343.**            Fraud by wire, radio, or television

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

**Title 18, United States Code, Section 1346.**     **Definition of "scheme or artifice to defraud"**

For the purposes of this chapter, the term "scheme or artifice to defraud" includes a scheme or artifice to deprive another of the intangible right of honest services.

Title 18, United States Code, Section 1503.   Obstruction of the Due Administration of
Justice

(a)   Whoever corruptly, or by threats or force, or by any threatening letter or communication,
endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any
court of the United States, or officer who may be serving at any examination or other proceeding
before any United States magistrate judge or other committing magistrate, in the discharge of his
duty, or injures any such grand or petit juror in his person or property on account of any verdict
or indictment assented to by him, or on account of his being or having been such juror, or injures
any such officer, magistrate judge, or other committing magistrate in his person or property on
account of the performance of his official duties, or corruptly or by threats or force, or by any
threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence,
obstruct, or impede, the due administration of justice, shall be punished as provided in subsection
(b). . .;

(b)   The punishment for an offense under this section is-. . .;

    (3) . . . imprisonment for not more than 10 years, a fine... or both.

**Title 18, United States Code, Section 981.**                                **Civil forfeiture**

(a) (1)  The following property is subject to forfeiture to the United States. . .;

> (C) Any property, real or personal, which constitutes or is derived from proceeds traceable to... any offense constituting "specified unlawful activity" (as defined in section 1956 (c)(7) of this title), or a conspiracy to commit such offense.

**Title 21, United States Code, Section 853.**                    Criminal forfeitures

**(a) Property subject to criminal forfeiture**

    Any person convicted of a violation of this subchapter or subchapter II of this chapter punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law--

(1) any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of such violation;

(2) any of the person's property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such violation. . .;

The court, in imposing sentence on such person, shall order, in addition to any other sentence imposed pursuant to this subchapter or subchapter II of this chapter, that the person forfeit to the United States all property described in this subsection. In lieu of a fine otherwise authorized by this part, a defendant who derives profits or other proceeds from an offense may be fined not more than twice the gross profits or other proceeds. . .;

**(p) Forfeiture of substitute property**

(1)    **In general**

    Paragraph (2) of this subsection shall apply, if any property described in subsection (a), as a result of any act or omission of the defendant –

(A) cannot be located upon the exercise of due diligence;

(B) has been transferred or sold to, or deposited with, a third party;

(C) has been placed beyond the jurisdiction of the court;

(D) has been substantially diminished in value; or

(E) has been commingled with other property which cannot be divided without difficulty.

(2)    **Substitute property**

    In any case described in any of subparagraphs (A) through (E) of paragraph (1), the court shall order the forfeiture of any other property of the defendant, up to the value of any property described in subparagraphs (A) through (E) of paragraph (1), as applicable.

**Title 28, United States Code, Section 2461.**                    Mode of Recovery

(c) If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. **17-20651** CR-SCOLA /TORRES

18 U.S.C. § 371
18 U.S.C. §§ 1343, 1346
18 U.S.C. § 1503
18 U.S.C. § 2



FILED by _____ D.C.

SEP 2 1 2017

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

UNITED STATES OF AMERICA,

v.

[1] CHRISTOPHER V. CICCIONE, II,
[2] JOSE BAYRON PIEDRAHITA-CEBALLOS, a/k/a "Cacheton," a/k/a "Montanero,"
[3] JUAN CARLOS VELASCO CANO, a/k/a "Cabezon,"

Defendants.

_____/

## INDICTMENT

The Grand Jury charges that:

### GENERAL ALLEGATIONS

At all times relevant to this Indictment:

#### Department of Homeland Security

1.     The United States Department of Homeland Security (DHS) is a federal agency under the Executive Branch of the United States government. DHS is charged with administering and enforcing various federal laws, including narcotics trafficking, border security, immigration, and customs.

2.     United States Immigration and Customs Enforcement (ICE) is an investigative agency within DHS. ICE enforces federal laws governing border control, customs, trade, and immigration to promote homeland security and public safety.

1

3.     Homeland Security Investigations (HSI) is a sub-agency within ICE and its agents are responsible for investigating various federal crimes, including, but not limited to, immigration, narcotics, and financial crimes.

## The Defendants

4.     At all times relevant to this Indictment, Defendant [1] CHRISTOPHER V. CICCIONE, II, was an HSI Special Agent and a federal law enforcement officer working in Miami, Florida. CICCIONE began his federal service in 2001 with the United States Customs Service, which was eventually absorbed into DHS.

5.     As an HSI Special Agent, CICCIONE had the authority to investigate violations of federal law, including, but not limited to, immigration, narcotics, and financial crimes. In this professional capacity, CICCIONE also had unique access to, and relationships with, other federal officials and their offices, including the United States Department of State, the Drug Enforcement Administration (DEA), and other divisions within DHS.

6.     Part of CICCIONE's responsibilities in Miami included developing and handling confidential human sources of information.

7.     As a federal law enforcement officer, CICCIONE owed a fiduciary duty to the United States and its citizens to perform the duties and responsibilities of his position honestly and free from corrupt influence.

8.     Defendant [2] JOSE BAYRON PIEDRAHITA CEBALLOS is a Colombian national who was indicted on June 20, 1996 in the Southern District of Florida in a Fourth Superseding Indictment in the case of the *United States of America v. Blas Antonio Gonzalez, et. al.* (Indictment #93-470). The Indictment charged PIEDRAHITA with participating in the Cali Cartel's

international drug trafficking racketeering enterprise. Indictment #93-470 was prosecuted by the United States Attorney's Office for the Southern District of Florida.

9.     Based on Indictment #93-470, an arrest warrant was issued for PIEDRAHITA; however, PIEDRAHITA remained a fugitive on these charges from the time he was indicted on June 20, 1996, through October 21, 2011, when Indictment #93-470 was dismissed.

10.    Defendant [3] JUAN CARLOS VELASCO is a Colombian national who is an associate of PIEDRAHITA and former HSI confidential source. CICCIONE developed and handled VELASCO as a confidential source.

<u>Operation Cornerstone</u>

11.    Indictment #93-470 was one of several indictments resulting from "Operation Cornerstone," a joint investigation initiated in 1991 by the United States Customs Service and the DEA into the criminal activities of the Cali Cartel, including, among other allegations, the importation of multi-ton amounts of cocaine into the United States. The indictments alleged that the Cali Cartel was a racketeering enterprise that used a defined hierarchy of leaders, attorneys, managers, and operators, and paid frequent, regular bribes to a number of politicians and military and police officials in Colombia.

12.    A series of HSI and DEA Special Agents investigated Operation Cornerstone from 1991, to 2011, and the United States Attorney's Office for the Southern District of Florida prosecuted the case.

3

## COUNT ONE
### Conspiracy to Defraud the United States, to Commit Honest Services Fraud, and to Obstruct Justice
(Title 18, <u>United States Code</u>, Section 371)

13.    Paragraphs 1 through 12 of the General Allegations section of this Indictment are re-alleged and incorporated as though fully set forth herein.

14.    Beginning at least as early as in and around February 24, 2010, the exact date being unknown to the Grand Jury, and continuing through on or about October 28, 2011, within the Southern District of Florida and elsewhere, the defendants,

> [1] CHRISTOPHER V. CICCIONE, II,
> [2] JOSE BAYRON PIEDRAHITA-CEBALLOS, a/k/a "Cacheton," a/k/a "Montanero,"
> [3] JUAN CARLOS VELASCO CANO, a/k/a "Cabezon,"

did knowingly and willfully combine, conspire, confederate, and agree with each other and other people, both known and unknown to the Grand Jury, to:

(1) defraud the United States of the honest and faithful services of CICCIONE and to interfere with its lawful governmental functions by deceit, craft, and trickery; and

(2) commit offenses against the United States specifically,

a.    To knowingly devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the United States of their right to the honest services of a public official; that is, to deprive the citizens of the United States of the honest services of CICCIONE, a federal law enforcement officer with HSI, through bribery, in violation of Title 18, <u>United States Code</u>, Sections 1343, and 1346; and

c.    To corruptly influence, obstruct, and impede and endeavor to influence, obstruct, and impede the due administration of justice in *United States v. Blas Antonio Gonzalez, et. al.*, Indictment #93-470, in the United States District Court for the Southern District of Florida, by

4

using a series of materially false statements, representations, and omissions about the investigation to persuade and attempt to persuade the United States Attorney's Office to dismiss the indictment, in violation of Title 18, United States Code, Section 1503.

### Purpose of the Conspiracy

15.     The purpose of the conspiracy was for the defendants to use CICCIONE'S official position to cause Indictment #93-470 against PIEDRAHITA to be dismissed and to benefit and enrich each other through bribery.

### Manner & Means of the Conspiracy

16.     The manner and means through which the defendants carried out the conspiracy included, but were not limited to, the following:

(a)     PIEDRAHITA and VELASCO offered and gave, and CICCIONE solicited and accepted, things of value, that is, among other things, cash; an expensive meal at a restaurant in Bogota, Colombia; a party at a Marriott hotel in Bogota, Colombia; liquor; and prepaid prostitutes.

(b)     CICCIONE, in his official position as an HSI Special Agent, falsified official records and lied to his supervisors and the United States Attorney's Office to cause Indictment #93-470 to be dismissed against PIEDRAHITA, and to obtain official authorization for PIEDRAHITA to enter into the United States.

17.     VELASCO served as an intermediary between PIEDRAHITA and CICCIONE, arranged for a meeting in Bogota, Colombia, received confidential information from CICCIONE about himself and others, and facilitated communication among members of the conspiracy.

18.     PIEDRAHITA used his personal assistants, A.G. and I.M., to communicate with CICCIONE, booked and paid for rooms at the Marriott hotel in Bogota from December 6, through December 9, 2010, and obtained the services of prostitutes for CICCIONE's benefit.

5

19.     CICCIONE used his official position as an HSI Special Agent to influence and attempt to influence officials within the United States Department of State to grant PIEDRAHITA a visa to enter the United States by falsely stating that PIEDRAHITA's indictment was being dismissed based on his cooperation, because he was "never fully identified," and because "no arrest warrant was ever issued...."

20.     CICCIONE used his official position as an HSI Special Agent to influence and attempt to influence officials at DHS to obtain a "Significant Public Benefit Parole" for PIEDRAHITA and his family to temporarily enter the United States by falsely claiming that PIEDRAHITA had no criminal record and "[n]o records of criminal activity were located in any data bases."

21.     CICCIONE caused and attempted to cause the dismissal of criminal charges against PIEDRAHITA in Indictment #93-470 by:

       i.     falsely altering DHS records in the "TECS" system to show that PIEDRAHITA was a "previous suspect" of a "closed case" rather than an indicted fugitive, falsely writing that the indictment was "being dismissed" based on PIEDRAHITA'S cooperation, and altering the record's "Primary" code designation;

      ii.     drafting and sending a memorandum to his supervisors containing material misrepresentations and false statements about PIEDRAHITA, including representations that PIEDRAHITA was "never positively identified," an arrest warrant had not been issued, and "[a]ll investigative leads and attempts to identify" PIEDRAHITA were "exhausted" and it was "unlikely" that he would "ever be positively identified"; and

      iii.     corruptly influencing prosecutors in the United States Attorney's Office for the Southern District of Florida to dismiss Indictment #93-470 by presenting the false memorandum to the United States Attorney's Office for the Southern District of

Florida, repeatedly requesting dismissal based on material misrepresentations, false statements, and omissions, and falsely stating that other case agents concurred with his recommendation to dismiss.

### Overt Acts

In furtherance of the conspiracy and to achieve its objects, defendants performed the following overt acts, among others:

22.     On or about February 24, 2010, CICCIONE emailed Assistant United States Attorney B.K., with the United States Attorney's Office for the Eastern District of New York.   CICCIONE informed B.K. that, with the approval of Assistant United States Attorney E.M., CICCIONE would seek dismissal of PIEDRAHITA's indictment. B.K. responded that PIEDRAHITA's cooperation did not have "any real value."  CICCIONE omitted Southern District of Florida Assistant United States Attorney E.M. from his e-mail.

23.     On or about July 16, 2010, VELASCO informed PIEDRAHITA that he spoke to CICCIONE "last night" to ask about "the thing with my friend" and CICCIONE replied that he "already asked" and "we can't go around asking like that because they'll be wondering, 'what's going on?' But it will come through, brother. It will come through. And you'll be the first to know."

24.     On or about August 11, 2010, VELASCO informed PIEDRAHITA that CICCIONE called that morning and said that "they had been reviewing" PIEDRAHITA's "thing for seven weeks," and that they would call to confirm.  During that same call, VELASCO told PIEDRAHITA that CICCIONE "seemed bummed" because HSI Confidential Source SA-2771-MI "is one of those guys who gets paid for information" and "apparently he's not going to get any more information from the man."

25.     On or about September 22, 2010, CICCIONE altered PIEDRAHITA's TECS database record to falsely report that PIEDRAHITA was a former suspect of a closed investigation, rather than the subject of a current operation.   CICCIONE added in the narrative section that PIEDRAHITA's case would be dismissed because it was "preextradition and the subject has and continues to cooperate."

26.     On or about October 21, 2010, VELASCO informed PIEDRAHITA, "He tells me that – that once he's done doing this favor for me…he's going to Washington…he told me, 'thank god I can do something for you two.'"   VELASCO continued, "You should see what kind of man he is…I mean, he introduced me to his family."   PIEDRAHITA responded, "Do you think that can be ready by November?"   VELASCO stated, "He tells me 'there's a lot of jealousy and they might go screw you guys…you guys have to be smart' because it's not good for him or for us either."   VELASCO later commented, "This man is very advantageous for me, dude."

27.     On or about November 1, 2010, VELASCO told PIEDRAHITA that he spoke to CICCIONE and HSI Confidential Source SA-222-MI was "naming names."

28.     On or about November 24, 2010, VELASCO told PIEDRAHITA that "I need you to send me a copy of your passport right now…" CICCIONE "and his boss are going to the State Department to authorize your thing.   The visa and everything right away."   Later in the conversation, VELASCO provided PIEDRAHITA with CICCIONE's government e-mail address. PIEDRAHITA stated that he would have "Astrid" send a copy of his passport to CICCIONE. VELASCO told PIEDRAHITA that CICCIONE was going to be transferred but wanted to help PIEDRAHITA with his "status" and was "fearful" because there are too many "frogs." VELASCO also told PIEDRAHITA, "Remember, we will be there from the 6th to the 9th." PIEDRAHITA responded, "Ok, at the Marriott." VELASCO stated, "He already has a reservation there…from

8

the 6th to the 9th." VELASCO also reminded PIEDRAHITA, "We have to pay with another currency."

29.    On or about November 24, 2010, PIEDRAHITA's assistant, A.G., e-mailed CICCIONE a photocopy of PIEDRAHITA's passport.  The copy of PIEDRAHITA's passport included PIEDRAHITA's full name, birth date, place of birth, and passport number.  PIEDRAHITA's passport also listed its issuance date as "February 8, 2008," in "Medellin" and included a photograph of PIEDRAHITA's face.

30.    On or about November 26, 2010, PIEDRAHITA told VELASCO that everything was "arranged" for the 6th and that there were "three divine women who are going to be there with us." PIEDRAHITA stated that he "picked the best," and "they sent them through a catalog." PIEDRAHITA also asked VELASCO, "Chris already has my paper?" VELASCO informed PIEDRAHITA that the "friend" is going with his bosses to take PIEDRAHITA's "paper to get approved." VELASCO informed PIEDRAHITA that "he tells me" that he needed PIEDRAHITA's passport because "they are going to go to Washington."

31.    On or about December 6, 2010, PIEDRAHITA told VELASCO, "Tell Chris I'm finishing up coordinating everything. Ok? For the deal tomorrow. That I'm here finishing up coordinating everything. Ok?" PIEDRAHITA also told VELASCO, "The pre-paid ones are coming later" and Chris "can make a request later."  VELASCO told PIEDRAHITA that "there is one more friend" so they needed to "speak differently."

32.    On or about December 6, 2010, CICCIONE and HSI Special Agent A.A. traveled to Bogota, Colombia.  CICCIONE and A.A. met with VELASCO, PIEDRAHITA and others at the Marriott Hotel in Bogota, Colombia.  The party and lodging for guests were paid by

9

PIEDRAHITA. During the party, CICCIONE consumed alcoholic drinks and had sexual relations with a prostitute, which were paid for by PIEDRAHITA.

33.    On or about December 7, 2010, CICCIONE and A.A. attended dinner at a private room in Pesquera Jaramillo, an upscale restaurant in Bogota, Colombia.  Dinner attendees included PIEDRAHITA, VELASCO, a Colombian Army Colonel, a well-known Colombia pop music star, and several females.  PIEDRAHITA paid for the dinner.

34.    During this trip, CICCIONE received a cash bribe from PIEDRAHITA and VELASCO. In the nine months following his December 9, 2010 trip to Bogota, CICCIONE deposited, or caused to be deposited, $17,700 in cash and spent $10,166.80 in cash.  In the one year period prior to December 9, 2010, CICCIONE had only deposited $50 in cash.

35.    In addition to the cash deposits, CICCIONE made several cash payments following the Bogota trip.  On December 16, 2010, CICCIONE made a $2,000 payment toward the balance of his Chase credit card.

36.    On June 29, 2011, CICCIONE paid $1,077.22 in cash for a U-Haul rental.

37.    On July 30, 2011, CICCIONE paid $5,000 in cash as a down-payment for a new 2011 Jeep Wrangler.

38.    On August 1, 2011, CICCIONE paid $1,189.58 in cash for a U-Haul rental.

39.    On or about February 8, 2011, CICCIONE drafted and emailed a memorandum to Group Supervisor R.R. (R.R.) requesting dismissal of individuals from Indictment #93-470, including PIEDRAHITA (Dismissal Memo).  CICCIONE drafted the Dismissal Memo and falsely stated that "[a]ttempts to identify" PIEDRAHITA "failed to positively identify" him, and as a result, he was "never positively identified" and "arrest warrants were never issued." CICCIONE's Dismissal Memo also stated that "[a]ll investigative leads and attempts to identify" PIEDRAHITA "have

been exhausted" and, since "no new information has been developed" "during" the "time-frame"

of the last fifteen years, it is "unlikely that" PIEDRAHITA "will ever be positively identified."

40.     On or about February 17, 2011, R.R. instructed CICCIONE that the Dismissal Memo must

state whether the dismissal is based on cooperation.

41.     On or about February 18, 2011, R.R. told CICCIONE that he could not state in the

Dismissal Memo that a defendant was unidentified if he was "convicted elsewhere," "a source,"

or "listed" in another "case, but fully identified."  R.R. further instructed CICCIONE to "triple

check" all of the names in the memorandum in "TECS, NADDIS, NCIC, STATE, INS,

TRAVEL," which are all confidential law enforcement databases.

42.     CICCIONE did not remove PIEDRAHITA's name from the Dismissal Memo, nor did he

edit the document to indicate that PIEDRAHITA was, in fact, identified.  On or about March 16,

2011, when CICCIONE was serving as acting Group Supervisor in R.R.'s absence, he sent the

Dismissal Memo to the HSI Assistant Special Agent in Charge for Miami, Florida for approval

without making the changes as instructed by R.R.  The Dismissal Memo was signed by the Special

Agent in Charge and sent to the United States Attorney for the Southern District of Florida.

43.     On or about June 16, 2011, PIEDRAHITA's associate, I.M., e-mailed CICCIONE copies

of passports belonging to PIEDRAHITA and PIEDRAHITA's wife.

44.     On or about June 20, 2011, CICCIONE sent an e-mail with the subject line, "Operation

Cornerstone," to Assistant United States Attorney F.T.  In the e-mail, CICCIONE requested a

status on the dismissal of the defendants from The Operation Cornerstone Indictment #93-470.

CICCIONE falsely advised F.T. that his DEA counterpart, Special Agent D.H., concurred, and

that the original ICE case agent, E.K., "stated that he was never able to fully identify the individuals

indicted," and that no arrest warrants were issued.

45.     On or about June 21, 2011, Assistant United States Attorney F.T. responded to CICCIONE. F.T. informed CICCIONE that F.T. was "not familiar with any requests for dismissal submitted any time recently," but that if CICCIONE could provide defendant's names and case numbers, F.T. could check the status. On the same day, CICCIONE responded, attaching the March 21, 2011 Dismissal Memo and falsely reiterating that: (1) none of the individuals in the memo had arrest warrants, (2) the original case agent was not able to identify the individuals during the course of the investigation, and (3) no one could obtain probable cause to "supersede another indictment." F.T. agreed to forward the case through his chain of command at the U.S. Attorney's Office.

46.     On or about June 24, 2011, CICCIONE forwarded I.M.'s e-mail containing PIEDRAHITA's passport to HSI Special Agent E.E. Also on or about June 24, 2011, CICCIONE sent E.E. a completed package for a Significant Public Benefit Parole for PIEDRAHITA and his family for processing by E.E. The forms falsely stated that (1) they were prepared by E.E. and (2) no records of criminal activity were located in any databases for PIEDRAHITA.

47.     On or about August 16, 2011, E.E. emailed HSI Special Agent N.E. of the Law Enforcement Parole Unit that El Paso Intelligence Center database record checks confirmed that PIEDRAHITA had an "open and active case in Colombia." E.E. wrote that although DEA listed PIEDRAHITA as a fugitive no warrants were ever obtained for him. E.E. told N.E. that Special Agent E.K. stated that individuals like PIEDRAHITA "held insignificant lower level positions within the organization or that he was not able to fully identify." E.E. received this false information sent to N.E. from CICCIONE.

48.     On or about August 17, 2011, CICCIONE conducted a law enforcement database query for PIEDRAHITA, which returned the following results in the following databases:

12

    a.   NADDIS (Narcotics and Dangerous Drug Information System): "Record indicates that the subject is ARMED AND DANGEROUS and that he is also a FUGITIVE"

    b.   TECS: "ALLEGED COCAINE SUPPLIER"

    c.   EPIC (El Paso Intelligence Center): indicated that PIEDRAHITA had been queried as part of multiple drug investigations.

49.    On or about September 30, 2011, HSI Special Agent P.H., the Section chief of the Law Enforcement Parole Unit, informed HSI Special Agent N.E. that DEA did not concur with CICCIONE's request for a Significant Public Benefit Parole for PIEDRAHITA. N.E. forwarded the response to CICCIONE. On or about that same day, CICCIONE responded to N.E., falsely stating that: (1) he had discussed the matter with his DEA counterpart, Special Agent D.H., (2) D.H. concurred with the decision to allow PIEDRAHITA to come to the United States to "work as a CI [confidential informant]", and (3) D.H. knew that the NADDIS record indicating that PIEDRAHITA was a fugitive was "made in error."

50.    On or about October 21, 2011, as a result of CICCIONE's repeated efforts and the resulting motion of the United States Attorney's Office, U.S. District Judge William M. Hoeveler dismissed the charges in Indictment #93-470 against 18 defendants, including PIEDRAHITA.

51.    On or about October 25, 2011, CICCIONE emailed VELASCO a copy of the Order of Dismissal from his personal email address.

52.    On or about October 28, 2011, CICCIONE emailed HSI Special Agent P.H., the Section chief of the Law Enforcement Parole Unit, and stated that he spoke with DEA Special Agent D.H. about a parole for PIEDRAHITA on two separate occasions. CICCIONE falsely told P.H. that Special Agent D.H. found NADDIS records for PIEDRAHITA, but concluded "there must have been a subject record error." CICCIONE also falsely stated that he communicated with retired

HSI SA E.K. about PIEDRAHITA and E.K. told him that there was never enough evidence and

he was never able to identify PIEDRAHITA and others in order to obtain arrest warrants.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH FIVE
### Honest Services Fraud
### (Title 18, United States Code, Sections 1343, 1346, 2)

53.     The allegations contained in paragraphs 1 through 52 of this Indictment are re-alleged and

incorporated by reference as though fully set forth herein.

54.     On or about each of the dates listed below, in the Southern District of Florida and

elsewhere, the defendants,

> [1] **CHRISTOPHER V. CICCIONE, II,**
> [2] **JOSE BAYRON PIEDRAHITA-CEBALLOS, a/k/a "Cacheton,"**
> **a/k/a "Montanero,"**
> [3] **JUAN CARLOS VELASCO CANO, a/k/a "Cabezon,"**

devised and intended to devise a scheme and artifice to defraud and deprive the United States and

its citizens of their right to the honest services of CHRISTOPHER V. CICCIONE, II, a federal law

enforcement officer, through bribery.

55.     On or about the dates listed below, in the Southern District of Florida and elsewhere,

defendants, aiding and abetting one another, for the purpose of executing the above-described

scheme and artifice to defraud and deprive, transmitted and caused to be transmitted by means of

wire and radio communication in interstate commerce, writings; that is, they caused the following

electronic mail messages to be transmitted via interstate commerce:

| Count | Date | Electronic Mail Transmission |
|-------|------|------------------------------|
| 2 | June 16, 2011 | E-mail message from I.M. to CICCIONE, which transmitted the passport belonging to PIEDRAHITA pursuant to instructions by VELASCO and CICCIONE. |
| 3 | June 21, 2011 | E-mail message from CICCIONE to Assistant United States Attorney F.T., which attached the Dismissal Memo that falsely stated that none of the defendants on the Dismissal Memo, including PIEDRAHITA, were identified during the course of the investigation. |
| 4 | June 24, 2011 | E-mail message from CICCIONE to HSI Special Agent E.E., which transmitted a completed copy of a DHS Significant Public Benefit Parole Authorization Form for PIEDRAHITA with false statements that he had "no records of criminal activity" and name checks were completed in six specific law enforcement databases for processing by E.E. |
| 5 | October 28, 2011 | E-mail message from CICCIONE to HSI Special Agent P.H., the Section chief of the Law Enforcement Parole Unit, which stated that CICCIONE spoke with DEA Special Agent D.H. about a parole for PIEDRAHITA on two separate occasions. CICCIONE falsely told P.H. that Special Agent D.H. found NADDIS records for PIEDRAHITA, but concluded "there must have been a subject record error." CICCIONE also falsely stated that he communicated with retired HSI Special Agent E.K. about PIEDRAHITA and E.K. told him that there was never enough evidence and he was never able to identify PIEDRAHITA and others in order to obtain arrest warrants. |

Each count a separate and distinct violation of Title 18, United States Code, Sections 1343 and 1346.

## COUNT SIX
### Obstruction of the Due Administration of Justice
### (Title 18, United States Code, Sections 1503, 2)

56.     The allegations contained in paragraphs 1 through 55 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

57.     From on or about February 8, 2011 to on or about October 21, 2011, in the Southern District of Florida, the defendants,

> [1] CHRISTOPHER V. CICCIONE, II,
> [2] JOSE BAYRON PIEDRAHITA-CEBALLOS, a/k/a "Cacheton,"
> a/k/a "Montanero,"
> [3] JUAN CARLOS VELASCO CANO, a/k/a "Cabezon,"

aiding and abetting one another, did corruptly influence, obstruct and impede and endeavor to influence, obstruct and impede the due administration of justice in the case of *United States v. Blas Antonio Gonzalez, et. al.*, Case No. 93-470 in the United States District Court for the Southern District of Florida, by using a series of materially false statements, representations, and omissions about the investigation to persuade the United States Attorney's Office to dismiss the indictment against PIEDRAHITA, in violation of Title 18, United States Code, Sections 1503 and 2.

### NOTICE OF CRIMINAL FORFEITURE
### (Title 18, United States Code, Section 981)

58.     The allegations contained in paragraphs 1 through 52 of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461.

59.     Pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, the defendant, CHRISTOPHER V. CICCIONE, II, upon conviction of the offense in violation of Title 18, United States Code, Section 371, set forth in Count 1; conviction

of the offense(s) in violation of Title 18, United States Code, Sections 1343, and 1346, set forth in

Counts 2, 3, 4, and 5 the defendants

> [1] CHRISTOPHER V. CICCIONE, II,
> [2] JOSE BAYRON PIEDRAHITA-CEBALLOS, a/k/a "Cacheton,"
>     a/k/a "Montanero,"
> [3] JUAN CARLOS VELASCO CANO, a/k/a "Cabezon,"

shall forfeit to the United States of America pursuant to Title 18, United States Code, Section

981(a)(1)(C), and Title 28, United States Code, Section 2461, any property, real or personal, which

constitutes or is derived from proceeds traceable to said violations.  The property to be forfeited

includes, but is not limited to, the following:

a.      A sum of money, the amount to be determined, in United States currency representing the

total amount of proceeds traceable, directly or indirectly, to the offense(s) in violation of Title 18,

United States Code, Sections 371, and 1343 & 1346.

b.      2011 Jeep Wrangler, VIN 1J4BA3H12BL609851.

60.     If any of the property described above, as a result of any act or omission of the defendant:

   a.      cannot be located upon the exercise of due diligence;

   b.      has been transferred or sold to, or deposited with, a third party;

   c.      has been placed beyond the jurisdiction of the court;

   d.      has been substantially diminished in value; or

   e.      has been commingled with other property which cannot be divided without

difficulty, the United States of America shall be entitled to forfeiture of substitute property

pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States

Code, Section 2461(c).  All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

Title 28, United States Code, Section 2461.

A TRUE BILL

FOREPERSON                                    DATE

ANNALOU TIROL
Acting Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


By: _____
Luke Cass
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice


By: _____
Jennifer A. Clarke
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

18

# Exhibit C

AO 442 (Rev. 01/09) Arrest Warrant

Certified to be a true and
correct copy of the document on file
Steven M. Larimore,  Clerk,
U.S. District Court
Southern District of Florida
By _____
Deputy Clerk
Date ____09/21/17____

# UNITED STATES DISTRICT COURT

### for the

### Southern District of Florida

17-20651

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No.  17-CR- |
| JOSE BAYRON PIEDRAHITA-CEBALLOS, | ) | |
| | ) | CR-SCOLA / TORRES |
| | ) | |

*Defendant*

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay

*(name of person to be arrested)*   JOSE BAYRON PIEDRAHITA-CEBALLOS                                                    ,

who is accused of an offense or violation based on the following document filed with the court:

☑ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☐ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:

Conspiracy to Defraud the United States, to Commit Honest Services Fraud, and to Obstruct Justice, in violation of Title 18,
United States Code, Section 371.

Honest Services Wire Fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

Obstruction of Justice, in violation of Title 18, United States Code, Section 1503

Date: 09/21/2017

_____
*Issuing officer's signature*

Alicia M. Otazo-Reyes
Hon. William C. Turnoff, U.S.M.J.

City and state:    Miami, Florida

_____
*Printed name and title*

| Return |
|---|
| This warrant was received on *(date)* _____ , and the person was arrested on *(date)* _____ at *(city and state)* _____ |
| Date: _____ |
| _____ *Arresting officer's signature* |
| _____ *Printed name and title* |

# Exhibit D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | Case Number 17-20651 |
|---|---|
| v. | |
| [1] CHRISTOPHER V. CICCIONE,II | AFFIDAVIT IN SUPPORT OF |
| [2] JOSE BAYRON PIEDRAHITA-CEBALLOS | REQUEST FOR EXTRADITION |
| a.k.a. "Cacheton," a.k.a. "Montanero" | |
| [3] JUAN CARLOS VELASCO CANO, | |
| a/k/a "Cabezon" | |

I, Reynaldo J. Rodriguez, being duly sworn, depose and state:

1.      I reside in the United States of America.

2.      I am a Special Agent with Department of Homeland Security (DHS), Office of Inspector General (OIG), in Miami, Florida, and have been employed as such since 2004.   Previously, I was a Special Agent with U.S. Immigration and Customs Enforcement (ICE) for approximately four years, and a Patrol Agent for the U.S. Border Patrol for approximately two years.

3.      DHS is one of the agencies within the U.S. government responsible for preventing terrorism and enhancing security; securing and managing borders; and enforcing and administering immigration laws.  DHS OIG conducts and supervises investigations, independent audits, and inspections of DHS programs and operations, including investigations into criminal misconduct of DHS employees, including employees of ICE and Homeland Security Investigations (HSI), one of ICE's operational directorates.  As a DHS OIG Special Agent, I have personally conducted and participated in many investigations of corrupt government officials and their associates.

4.      Based on my training and experience as an agent with DHS OIG, I am familiar with the means and methods that corrupt government officials use to perform official acts in exchange for monetary gifts and other things of value, and the means by which they conceal their acts and ill-

gotten gains.  I am also knowledgeable about the criminal statutes of the United States, in particular those which relate to bribery, wire fraud, obstruction of justice, and money laundering offenses.

5.      My official duties have included the investigation of JOSE BAYRON PIEDRAHITA CEBALLOS, also known as (a.k.a.) Jose Bayron Piedrahita-Ceballos, a.k.a. "Cacheton," a.k.a. "Montanero" (PIEDRAHITA) in the case entitled <u>United States of America v. Christopher V. Ciccione, II, et al.</u>, Case Number. 17-20651. As one of the lead investigators, I am familiar with the evidence in the case.

## I. BACKGROUND

6.      In August 2011, DHS OIG and ICE officials (collectively, "U.S. law enforcement officials") began investigating HSI Special Agent Christopher V. Ciccione, II (Ciccione), on suspicion that Ciccione had accepted unlawful payments from non-U.S. citizens for helping them obtain immigration benefits.  During the investigation, U.S. law enforcement officials found evidence of Ciccione's misconduct involving PIEDRAHITA, a high-level Colombian drug trafficker and member of the criminal organization known as the Cali Cartel and, presently, *La Oficina de Envigado.*  Specifically, the investigation has revealed that PIEDRAHITA provided gifts and other things of value to Ciccione in exchange for official acts by Ciccione, including the dismissal of a federal indictment against PIEDRAHITA, and attempts to obtain entry into the United States for PIEDRAHITA.  The evidence also shows that Juan Carlos Velasco Cano (Velasco), a former HSI source of information and associate of PIEDRAHITA, helped facilitate the corrupt agreement.

## II. EVIDENCE

7.      On June 20, 1996, PIEDRAHITA and many others in the Cali Cartel were indicted by a grand jury in the Southern District of Florida for drug trafficking and money laundering offenses as part of a law enforcement case called Operation Cornerstone.  The case, entitled <u>United States.</u>

v. Blas Antonio Gonzalez, et. al., was charged by a Fourth Superseding Indictment under docket number 93-CR-470 (the Indictment). Arrest warrants for PIEDRAHITA and others indicted were summarily issued. PIEDRAHITA was never arrested and remained a fugitive for many years.

8.      In approximately 2008, Ciccione became the lead case agent for Operation Cornerstone. When Ciccione took over the case, Operation Cornerstone was essentially a "fugitive file," as many of the indicted individuals had been arrested and convicted and the only remaining open cases involved fugitives.

9.      On October 13, 2009, Ciccione documented Velasco as a source of information with HSI. Ciccione served as Velasco's handler. Velasco is a Colombian national with former ties to the Cali Cartel, and is also a close associate of PIEDRAHITA.

## The Gifts

10.      In November 2010, Ciccione obtained official authorization from his agency to travel to Colombia from December 6 through December 9, 2010. To justify his travel, Ciccione stated that he would be investigating money laundering activities as part of an investigation wholly unrelated to PIEDRAHITA. Ciccione also stated that meetings were scheduled to "occur at the JW Marriott on December 7 and 8, 2010 in the hotel conference room." Ciccione did not mention Operation Cornerstone as a travel justification.

11.      Colombian authorities lawfully intercepted conversations between PIEDRAHITA and Velasco during November and December 2010. On November 24, 2010, at 3:38 p.m., a conversation between Velasco and PIEDRAHITA was lawfully intercepted. During the conversation, Velasco asked PIEDRAHITA to send him (Velasco) a copy of PIEDRAHITA's passport "right away" because "Chris [Ciccione] and his boss are going to the State Department to authorize … the visa and everything right away." Velasco told PIEDRAHITA to send his passport to Ciccione directly, and provided PIEDRAHITA with Ciccione's government email

address. PIEDRAHITA stated that he would have his assistant send a copy of his passport to Ciccione. Velasco and PIEDRAHITA discussed meeting Ciccione in Colombia from December 6 through 9, 2010.  Velasco spoke with PIEDRAHITA about "that thing they are going to do to get you approved…to get everything approved for you right away," and told PIEDRAHITA that they would have to pay with "a different currency."  At 4:04 p.m., lawfully intercepted communications revealed that PIEDRAHITA's assistant emailed Ciccione a copy of PIEDRAHITA's Colombian passport.

12.     Two days later, on November 26, 2010, Velasco and PIEDRAHITA were again lawfully intercepted.  PIEDRAHITA told Velasco that everything was organized for "the sixth."  Velasco told PIEDRAHITA that the "friend" is going with his bosses to take PIEDRAHITA's "papers to get approved."  Velasco said that "he told me" that he needed PIEDRAHITA's passport because "they are going to Washington."

13.     On November 28, 2010, Velasco and PIEDRAHITA were lawfully recorded discussing PIEDRAHITA's assistance with obtaining the possible cooperation of two individuals imprisoned in Colombia.  Velasco and PIEDRAHITA conferenced Ciccione in later in the call. Ciccione told them, "Listen, we got a good thing going. I'm just trying to keep any bullshit- remember we talked about people talking shit? I don't know where it's coming from or why, but I'm trying to keep it from causing problems. [Be]cause… all it does is cause problems."  Velasco, in turn, translated what Ciccione said to PIEDRAHITA in Spanish, "What he doesn't want is for anyone to talk shit because he's doing your things, you understand?... He's telling me he doesn't want anyone interfering or putting the brakes on him because he's taking care of all of your status, man…So he's pushing now, he doesn't want them to stop him."

14.     Ciccone traveled to Colombia in December 2010 to meet with Velasco and PIEDRAHITA. The men stayed at the Marriott hotel located in Bogota, Colombia. During this trip, PIEDRAHITA paid for a party at the hotel, which included alcohol and prostitutes.

Ciccione, PIEDRAHITA, Velasco, and others participated in the festivities. That evening, a woman believed to be a prostitute checked into Ciccione's hotel room. U.S. law enforcement authorities determined that PIEDRAHITA paid the prostitute to engage in sexual activity with Ciccione. The next evening, Ciccione joined PIEDRAHITA, Velasco, and others at a private dinner held in the wine cellar of a high-end restaurant in Bogota. During this trip, PIEDRAHITA personally gave Ciccione a cash bribe, believed to be approximately US$20,000 to US$25,000. Ciccione documented the trip as required for an unrelated money laundering investigation, but made no mention of PIEDRAHITA when reporting details of the trip to his supervisors. Ciccione never conducted any meetings at the JW Marriott hotel.

15.     In the months following Ciccione's December 2010 trip to Bogota, his cash deposits and spending increased significantly. From December 2008 to December 9, 2010, cash deposits into his bank accounts totaled approximately US$50. However, in the nine months following December 9, 2010, Ciccione's cash deposits and cash spending were approximately US$27,866.80, with approximately US$17,700 in cash deposits.

### The Official Acts

16.     In exchange for the cash and other things of value, Ciccione took specific action to (1) obtain access for PIEDRAHITA to travel to the United States, and (2) obtain dismissal of the Indictment against PIEDRAHITA.

17.     On February 8, 2011, Ciccione sent his Group Supervisor a draft of a memorandum requesting dismissal of twenty individuals charged in the Indictment, including PIEDRAHITA. The memorandum falsely stated that the "individuals that are being submitted have never been fully identified during the course of the investigation," "no arrest warrants have been issued for the individuals," and "[a]ll investigative leads were exhausted without success."

18.     On February 17, 2011, the Group Supervisor responded to Ciccione, reminding him that if the dismissal request is based on cooperation, then it needs to "state that in the memo." On

February 18, 2011, the Group Supervisor told Ciccione to "make sure there are no ... names on

the list" where the subject has been identified or was otherwise cooperating.   The Group

Supervisor instructed Ciccione to "triple check" all names in law enforcement databases to be

sure.

19.     Despite his supervisor's admonition and instruction, and despite the fact that Ciccione

had determined that PIEDRAHITA had been identified as someone involved in criminal activity

in multiple law enforcement databases, Ciccione did not remove PIEDRAHITA's name from the

dismissal memorandum.  Furthermore, Ciccione never sent it back to his Group Supervisor for

approval.  Instead, Ciccione circumvented his chain of command and directly emailed the

assistant special agent in charge with an updated dismissal memorandum on March 7, 2011.  In

the memorandum, Ciccione maintained that, for the individuals listed, including PIEDRAHITA,

"[a]ttempts to identify the subjects ... prior to and subsequent to the indictments have failed to

positively identify all but two of the individuals."  According to the memorandum, the two

positively identified individuals were listed after the "unidentified" individuals and were known

to be deceased.  The memorandum further stated that "Arrest warrants were never issued"

because the individuals were never positively identified.  The memorandum also stated that "no

new information has been developed," and "it is unlikely that these individuals will ever be

positively identified."  These claims were false.  As stated earlier, arrest warrants had been

issued at or near the time of the Indictment.  PIEDRAHITA and others on the list had been

identified by Ciccione and other law enforcement agents.

20.     The memorandum requesting dismissal of the Indictment was signed by the ICE Special

Agent in Charge on March 21, 2011, and later submitted to the U.S. Attorney for the Southern

District of Florida.

21.     Once the dismissal request was assigned to a prosecutor at the U.S. Attorney's Office,

Ciccione made efforts to follow up on the request.  Ciccione sent several emails to the prosecutor

over the next several months, requesting updates on the dismissal of the Indictment.

22.      On June 16, 2011, PIEDRAHITA's associate, I.M., emailed CICCIONE copies of

passports belonging to PIEDRAHITA and PIEDRAHITA's wife.

23.      On June 20, 2011, Ciccione emailed the prosecutor to request a status update on the

dismissal memo.  Ciccione reiterated his false allegations in the memorandum, namely, that the

individuals in the memo had never been fully identified and no arrest warrants had ever been

issued.  The prosecutor replied to Ciccione the next day, and said he was just "babysitting" the

case and would check on the status.  Later that same day, June 21, 2011, Ciccione responded,

falsely, that none of the defendants were identified during the course of the investigation and

attached a signed copy of the dismissal memo.

24.      During the same time period, Ciccione attempted to obtain a significant public benefit

parole for PIEDRAHITA and his family members, which would allow them entry, without a

visa, into the United States for a limited period of time.  Specifically, on June 24, 2011, Ciccione

emailed a fellow special agent a completed DHS Significant Public Benefit Parole Authorization

Form (SPBP) for PIEDRAHITA. The form stated that (1) it was prepared by another agent; and

(2) PIEDRAHITA had no criminal record, criminal convictions, and no records of criminal

activity were located in any databases.  Ciccione listed PIEDRAHITA's occupation as being

"Textiles," and listed the address for the Mandarin Oriental hotel in Miami as PIEDRAHITA's

U.S. address.  The other special agent, who was a brand new agent and considered Ciccione to be

a mentor, processed the paperwork without questioning its truthfulness.

25.      On August 8, 2011, Ciccione emailed the prosecutor requesting a status update on the

pending dismissal memorandum.

26.      On August 16, 2011, Ciccione checked PIEDRAHITA's name in multiple government

criminal history databases and received positive results on August 17, 2011.  One of the

databases, Narcotics and Dangerous Drug Information System, reported that PIEDRAHITA was

an armed and dangerous fugitive with eight active cases, who was listed as a suspected drug trafficker on a DEA Mexico City watch list.  Despite receiving this information about PIEDRAHITA, Ciccione continued to request updates from the prosecutor on the dismissal of the Indictment on August 29, 2011; September 16, 2011; and October 19, 2011.

27.     Based on Ciccione's assertions to the prosecutor, the management at the U.S. Attorney's Office approved the request for dismissal.  Upon motion by the prosecutor, U.S. District Judge William Hoeveler signed an order of dismissal, and the Indictment against PIEDRAHITA was dismissed on October 21, 2011.

28.     On October 25, 2011, at 11:17 a.m., the prosecutor sent Ciccione a copy of the signed dismissal order.  Also on October 25, 2011, Ciccione emailed a copy of the dismissal order to Velasco from his government email address.

29.     After receiving the dismissal order, on October 28, 2011, Ciccione emailed the SPBP coordinator asking for assistance with granting a parole for PIEDRAHITA to enter the United States.  Ciccione explained that there was an indictment dismissal of numerous individuals related to the Cali Cartel and that none of them had arrest warrants.

### III. IDENTIFICATION

30.     JOSE BAYRON PIEDRAHITA CEBALLOS, a.k.a. Jose Bayron Piedrahita-Ceballos, a.k.a. "Cacheton," a.k.a. "Montanero," is a citizen of Colombia, born on December 27, 1958, in Colombia. He is the holder of Colombian cedula 8,399,245. He is described as standing approximately 5 feet and 8 inches in height, with graying hair and green eyes.  Attached to this affidavit as **Attachment 1** is a photograph of JOSE BAYRON PIEDRAHITA CEBALLOS. Two Special Agents of the U.S. Drug Enforcement Administration who took part in the investigation, have identified the photograph in **Attachment 1** as depicting PIEDRAHITA, the person whose criminal activities are described in this affidavit.   In addition, law enforcement authorities in Colombia have confirmed that the person depicted in **Attachment 1** is the person arrested on the provisional arrest warrant issued in this case.


Reynaldo J. Rodriguez
Special Agent
U.S. Department of Homeland Security
Office of the Inspector General


SIGNED AND SUBSCRIBED TO BEFORE ME
THIS __3__ DAY OF _November_, 2017


HON. Robert N. Scola, JR
U.S. ~~Magistrate Judge~~ District Judge
Southern District of Florida

# Attachment 1



| | Registraduría Nacional del Estado Civil<br>Dirección Nacional de Identificación<br>Informe sobre Consulta Web | dvasquez<br>Aug 28, 2017 5:50 PM<br>192.168.1.160 |
|---|---|---|

## Informe de la Vista Detallada de la Consulta



Número de Documento (NUIP): 8,399,245
Número de Documento (NIP):
Número de Preparación: 24990776
Primer Apellido: PIEDRAHITA
Partícula: Ninguna
Segundo Apellido: CEBALLOS
Primer Nombre: JOSE
Segundo Nombre: BAYRON
Sexo: Masculino
Fecha de Nacimiento: 27/12/1958
Lugar de Nacimiento: BELLO - ANTIOQUIA
País de Nacimiento: COLOMBIA
Departamento de Nacimiento: ANTIOQUIA
Municipio de Nacimiento: BELLO
Estatura: 179
Fecha de Preparación: 31/05/2007
Departamento de Preparación: CUNDINAMARCA
Municipio de Preparación: BOGOTA D.C.
Zona de Preparación: BOGOTA D.C.
Fecha de Expedición: 11/08/1977
Departamento de Expedición: ANTIOQUIA
Municipio de Expedición: BELLO
Zona de Expedición: BELLO
Vigencia: VIGENTE
Clase de Expedición: Duplicado CC
Motivo de Rectificación:

Grupo Sanguíneo y Factor RH: O+
Código de Señales Particulares: NINGUNA
Dirección de Residencia: CRR 39 13 SUR 110
Ciudad de Residencia:
Teléfono: 3138843
Tipo del Documento Base: Cédula de Ciudadanía
Número del Documento Base:
Notaría del Documento Base:
Huella Impresa:
Número de Impresión:
Fecha de Fabricación:
Validez: Valida
Estado de la versión: Actual

    

Pulgar Derecho | Indice Derecho | Medio Derecho | Anular Derecho | Meñique Derecho

    

Pulgar Izquierdo | Indice Izquierdo | Medio Izquierdo | Anular Izquierdo | Meñique Izquierdo